CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 10 2018

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| CLARENCE EDWARD WHITAKER, on behalf of himself and as Administrator of the Estate of Shannon Marie Whitaker, deceased, | ) ) ) ) ) ) | Case No. 7:17-cv-00055 |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| HYUNDAI MOTOR COMPANY, et al., | ) ) ) | By:   Michael F. Urbanski Chief United States District Judge |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Shannon Whitaker ("Shannon") was crushed to death by a 2007 Hyundai Santa Fe

(the "Vehicle"). Plaintiff Clarence Whitaker ("Whitaker") filed suit against Defendants

Hyundai Motor Company ("HMC") and Hyundai Motor America, Inc. ("HMA," and

collectively with HMC, "Defendants"). After several false leads, the parties discovered that a

solenoid in the Vehicle's steering column was disconnected. That solenoid is designed to

prevent an individual from removing an ignition key when a vehicle's transmission is not in

the Park position. Who disconnected the solenoid—or whether the solenoid was ever

connected—is in dispute.

This matter comes before the court on a multitude of motions. Defendants have filed

a Motion for Summary Judgment, ECF No. 63, which seeks summary judgment on

Whitaker's Complaint (the "Complaint" or "Compl."), ECF No. 1. Additionally, both

Defendants and Whitaker have filed motions to exclude the opposing parties' expert witnesses (the "Motions in Limine"). See Mot. Exclude Pl.'s Witnesses, ECF No. 65; Pl.'s Mot. Limine Exclude Testimony Defs.' Expert Witness Eddie Ray Cooper, ECF No. 68; Pl.'s Mot. Limine Exclude Testimony Defs.' Expert Charles A. Rau, Jr., ECF No. 69. For the reasons discussed below, the Motions in Limine will be **DENIED**, and Defendants' Motion for Summary Judgment will be **DENIED**.[1]

## I.    Motions in Limine

Federal Rule of Evidence 702 states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" the following four criteria are established:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court of the United States has held that Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). Accordingly, the Supreme

---

[1] Additionally, Defendants have filed a Motion for Reconsideration of Order Granting Voluntary Dismissal Without Prejudice (the "Motion for Reconsideration"), ECF No. 100. Defendants seek reconsideration of the court's Order granting Whitaker's Motion for Voluntary Dismissal of Certain Claims ONLY (the "Motion for Voluntary Dismissal"), ECF No. 94. That Order dismissed without prejudice: (i) Counts III, IV, and VI of the Complaint; (ii) recitations and claims set forth in paragraphs 18 through 22, 24, 26, 36, and 38 through 40 of the Complaint; and (iii) those portions of paragraphs 23, 27, 29, 31, 35, and 44 that referenced the other dismissed portions of the Complaint. Defendants ask the court to reconsider its dismissal without prejudice and, instead, dismiss those parts of the Complaint with prejudice.

At the August 21, 2018 hearing on the pending motions, Whitaker agreed that the claims and paragraphs at issue could be dismissed with prejudice. Accordingly, the court **GRANTS** the Motion for Reconsideration and **GRANTS** the Motion for Voluntary Dismissal **WITH PREJUDICE**.

Court in Daubert expounded upon the relevancy and reliability requirements of Rule 702.

First, in order to establish "a standard of evidentiary reliability," an expert must testify about

scientific knowledge.[2] Id. at 589–90. This means that the testimony must be "grounded in

the methods and procedures of science" and must consist of "more than subjective belief or

unsupported speculation." Id. at 590. Second, in order to ensure relevancy, the expert's

evidence or testimony must "'assist the trier of fact to understand the evidence or to

determine a fact in issue.'" Id. at 591 (quoting Fed. R. Evid. 702). This "'helpfulness'

standard requires a valid scientific connection to the pertinent inquiry as a precondition of

admissibility." Id. at 591–92.

When faced with potential expert testimony, then, the trial judge must make a

"preliminary assessment of whether the reasoning or methodology underlying the testimony

is scientifically valid and of whether that reasoning or methodology properly can be applied

to the facts in issue."[3] Id. at 592–93. In particular, the Fourth Circuit Court of Appeals has

"admonished that 'a plaintiff may not prevail in a products liability case by relying on the

opinion of an expert unsupported by any evidence such as test data or relevant literature in

the field.'" Oglesby v. Gen. Motors Corp., 190 F.3d 244, 249 (4th Cir. 1999) (quoting

Alevromagiros v. Hechinger Co., 993 F.2d 417, 422 (4th Cir. 1993)).

---

[2] The Daubert court focused on Rule 702's requirement of scientific knowledge because of the particular facts of the case but noted that Rule 702 also allows testimony based on technical or other specialized knowledge. Daubert, 509 U.S. at 590. In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court held that the Daubert analysis applies beyond just scientific knowledge to technical or other specialized knowledge. Id. at 147–48.

[3] The Daubert court then developed four factors to assess the validity of an expert's scientific reasoning or methodology: (1) whether the theory or technique "can be (and has been) tested"; (2) whether "the theory or technique has been subjected to peer review and publication"; (3) the "known or potential rate of error" of the scientific theory or technique"; and (4) whether the theory or technique has been generally accepted within the relevant scientific community. Daubert, 509 U.S. at 593–94.

### A. Motion to Exclude Plaintiff's Experts

Defendants' motion in limine to exclude the testimony of William Carden, Whitaker's materials engineering expert, ECF No. 66, is **DENIED**. The court has considered Carden's report, supplemental report, deposition and testimony at the August 21, 2018 hearing, and finds that Carden's opinions are amply supported by Carden's experience, training, and analysis, and the available scientific literature cited by Carden.

At the threshold, the court believes that Carden's supplemental report, ECF No. ECF No. 78-9, is properly before the court. Carden's report was prepared, and he was deposed, before Defendants submitted their expert reports. At Carden's deposition, Whitaker's counsel reminded defense counsel that his expert report may be supplemented upon review of Defendants' expert reports. Given these circumstances, Defendants cannot claim to be surprised by Carden's supplemental report. Nor are they prejudiced, as they had an opportunity to redepose Carden, which they declined to do, and an opportunity to cross examine him at the August 21, 2018 hearing.

Carden is Registered Professional Metallurgical Engineer who performs failure analysis and engineering investigation for McSwain Engineering, Inc. Carden has worked in materials engineering for more than twenty years and is a member of several well-regarded professional societies, including the American Society of Mechanical Engineering (ASME) and the Society of Automotive Engineers (SAE).

Carden orchestrated the two-day laboratory examination of the Vehicle and solenoid connection at issue in this case based on an investigative protocol circulated to the defense. Defendant's engineering expert, Charles Rau, participated in the laboratory examination and

voiced no concerns over the methodology employed. Each side had access to the hundreds of photographic, microscope, electron microscope, spectroscopy and CT images taken during the examination. Carden prepared a detailed written report describing his methodology, conclusions and basis for his conclusions. In essence, based on his examination of scratch or gouge marks on the metal connector blades of the subject solenoid connector and his comparison to exemplar connectors, Carden opined that the connector "was not fully engaged in its locked position at the time the subject vehicle was manufactured," and later became completely disengaged, allowing the ignition key to be removed even though the gear shifter was not in the "Park" position.

Defendants quarrel with Carden's opinion, arguing that he engaged in an unreliable "cherry-picking scratch methodology and leaps of logic." The court disagrees. Carden is a trained metallurgical engineer with years of experience in failure analysis investigations. The examination of the subject vehicle and solenoid connector was methodologically mapped out, painstakingly undertaken and well-documented. Carden bases his opinion on physical marks found on the metal solenoid connector blades, indicating to him that the connector was never fully engaged. While Defendants disagree with Carden's conclusion, there is no basis to question his qualifications, experience, the use of the scientific method, the rigor of the testing procedure or that data obtained from the physical examination. To the extent defendants complain that Carden used inconsistent lighting and magnification to justify his conclusions, those concerns go to the weight of Carden's testimony, and not its admissibility. As such, he may be cross-examined about the claimed inconsistency in his technique.

Defendants also argue that Carden's report ignored their alternative explanation for the solenoid's disassembly, centered around the aftermarket installation of a radio and microphone, but Carden addresses this theory in his supplemental report. As such, Carden's opinion, grounded in the data obtained from his scientific examination of the solenoid connector, is more than subjective belief or unsupported speculation. Moreover, it is plainly helpful to the trier of fact. As such, it is admissible under Fed. R. Evid. 702 and sufficiently reliable under Daubert.

Defendant's motion in limine to exclude the testimony of Richard Clarke, Whitaker's failure analysis expert, ECF No. 66, is **DENIED**. Federal Rule of Evidence 703 does not require an expert to perform his own analysis. Instead, he may merely have "been made aware of or personally observed" the facts or data that informed his opinion, Fed. R. Evid. 703, exactly the complaint levied by Defendants. Because the court has already held that Carden's testimony is admissible at trial, Clarke's opinion, founded on Carden's investigation, likewise is admissible.

### B. Plaintiff's Motion in Limine to Exclude the Testimony of Defendants' Expert Witness Eddie Ray Cooper

Whitaker's motion in limine to exclude the testimony of Eddie Ray Cooper, Defendants' automotive expert, ECF No. 68, is **DENIED**.

Cooper is expected to provide expert testimony concerning how the solenoid connector functions as part of the Vehicle's safety system. Cooper also is expected to support Rau's expected metallurgical testimony that the metal blades in the solenoid connector exhibited evidence of being fully engaged by describing his observation of certain gouge marks in the plastic housing of the solenoid connector. Cooper is expected to testify

these marks indicated to him that the lock tabs in the plastic connector housing were mechanically disconnected using a metal tool. Cooper bases his testimony on the common use of such tools in the industry and the fact that he has used such a tool to separate the two halves of such connectors many times. Deposition of Eddie Ray Cooper ("Cooper Dep."), ECF 67-2, at 20, 36. Although Cooper will not be permitted to testify as to when, why, or by whom the tool marks were made, he may testify as to the separation of the plastic housing by means of a metal tool, as it was "pretty clear" based on the tool marks. Id. at 32, 36. Cooper bases these opinions on two examinations of the subject solenoid connector and ten exemplar connectors taken from Hyundai Santa Fe vehicles that did not have similar gouge marks. Id. at 30.

Whitaker argues that Cooper's opinions "are nothing more than rank, unsubstantiated speculation. They are definitely not the product of any scientific method or recognized methodology." Pl's. Rebuttal to Def.'s Opp. to Pl'.s Mot. Exclude Defense Expert Eddie Ray Cooper, ECF No. 86, at 7. Whitaker complains that Cooper did not test or try to replicate the creation of the gouge marks in the plastic housing.

There is no dispute that certain gouge type marks appear on the plastic housing of the subject solenoid connector. There is likewise no dispute that Cooper obtained ten similar solenoid connectors from Hyundai Santa Fe vehicles and found no gouge marks on those connectors. Cooper provides the jury with his own experience in using tools to separate such connectors and his opinion that the gouge marks on the subject connector appear to him to be tool marks. At his deposition, Cooper testified that he has used such tools to separate the two halves of a connector many times, that he observed gouge marks on the plastic housing

of the subject solenoid connector consistent with such tool use. He further testified that he observed evidence of the aftermarket installation of a microphone wire in the area near the subject solenoid connector. Plainly, Cooper may testify that he saw tool marks on the subject connector based on his experience with using tools on such connectors on many other occasions. Cooper may testify concerning the absence of such marks on the ten exemplar connectors removed from similar Hyundai Santa Fe vehicles. Whitaker's objection as to Cooper's lack of testing goes to the weight, rather than the admissibility, of this testimony, founded as it is on Cooper's own experience with such connectors and tools, combined with the absence of such marks on the exemplar connectors.

### C. Plaintiff's Motion in Limine to Exclude the Testimony of Defendants' Expert Witness Charles A. Rau

Whitaker's motion in limine to exclude the testimony of Charles A. Rau, Jr., Defendants' metallurgy expert, ECF No. 69, is **DENIED**.

As was the case with Cooper, Whitaker challenges Rau's opinion regarding whether the solenoid connector had been fully engaged. Rau opines that his investigation of both the plastic and metal parts of the connector support his opinion that the connector had been fully connected. First, as to the plastic housing, Rau identified portions of the plastic flashing that were squashed, indicating the connection had been fully made. Rau's opinion that the plastic connector had been fully joined at one point was bolstered by the tool marks he saw and Cooper's testimony as to use of a metal tool to separate such connectors. Second, as to the metallurgical examination, Rau testified that analysis of the metal blades showed the presence of carbon well beyond the end point identified by Carden, which he stated was evidence of an electrical connection between the metal blades at that point. Thus, Rau

opines that his examination of the plastic and metal portions of the connector confirm that it had been fully joined and the vehicle operated with the connector in that configuration.

Whitaker first contends that Hyundai's counsel limited the range of Rau's opinions at deposition, confining him to metallurgical aspects of the case. The court disagrees. While it was pointed out that Cooper would testify as to the systemic operation of the solenoid connector, Rau made it clear that he was "focusing primarily on the materials evaluation, the laboratory evaluation, not on the - - the functional testing of the system," which was being covered by Cooper. Deposition of Charles A. Rau, Jr., ECF No. 76-3, at 13. In both his report and deposition, Rau described physical and elemental attributes of both the plastic and metal portions of the subject solenoid connector that support his conclusion that it had been fully connected.

Rau's opinion, grounded in his education, years of experience and his detailed and well-documented examination of the subject solenoid connector and exemplars, is otherwise not subject to a Daubert challenge. Rau opines that compression of the flashing on the plastic connector and tool marks on its interior support his conclusion that the connector had been fully joined. Rau further supports his opinion by comparison of the subject plastic connector with ten exemplars taken from other Hyundai Santa Fe vehicles. Rau's tests of the elemental composition of metal blades of the connectors revealed carbon content consistent with an electrical connection at points on the blades far beyond the scratch marks noted by plaintiff's expert Carden. This elemental analysis leads Rau to conclude that the blades had been fully joined and operational for some period of time. Rau further explains that he tried to get an exemplar to partially connect, or "perch," but was not able to do so.

Whitaker's concerns about the work done by Rau and his conclusions ultimately go to the weight of his testimony, and not its admissibility. He will be permitted to testify as to the opinions stated in his report and deposition.

## II.    Summary Judgment Standards

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)).

Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

### III.    Background

On October 16, 2015, Shannon pulled into the driveway to the side of her home, which had a slight downward slope. Deposition of Jamie Ryan Brown, ECF No. 63-7, at 30–31. She turned the engine off and removed the key from the ignition of the Vehicle without realizing that the transmission was still in drive. Id. at 32. As she exited, the Vehicle rolled forward and crashed into the side of her house. Pulaski Police Department Death

Investigation ("Police Report"), ECF No. 78 Ex. B, at 15. She was found deceased, with her head and neck pinned between the door and the door frame. Id.

There were no witnesses to the accident. Nonetheless, Shannon had grass marks on her knees, suggesting she had been dragged along with the car. Deposition of Richard A. Clarke ("Clarke Dep."), ECF No. 81-1, at 55. Additionally, the ignition key was found underneath Shannon, suggesting that she had removed the key before the car reached. Police Report, at 15.

During the investigation, the parties discovered that a solenoid in the steering column of the Vehicle was disconnected. Deposition of William Carden ("Carden Dep."), ECF No. 67-1, at 21. If the solenoid is not connected, the ignition key may be removed without the Vehicle's transmission being placed in park. Id. at 105. Upon inspection, the parties also discovered a wireless microphone wire had been routed in the steering column near the solenoid. Id. at 21–22.

### IV.    Motion for Summary Judgment

Count II, the only remaining claim, pleads breach of implied warranty of merchantability against Defendants. To establish a successful breach of implied warranty of merchantability case, a plaintiff must demonstrate:

> (1) that the goods were unreasonably dangerous for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose; and (2) that the unreasonably dangerous condition existed when the goods left the manufacturer's hands.

Lecs v. Dow Chem. Co., 976 F. Supp. 393, 398 (W.D. Va. 1997) (quoting Morgen Indus. Inc. v. Vaughan, 252 Va. 60, 65, 471 S.E.2d 489, 492 (1996)).

An unreasonably dangerous product is "defective in assembly or manufacture, unreasonably dangerous in design, or unaccompanied by adequate warnings concerning its hazardous properties." Morgen Indus. Inc. v. Vaughan, 252 Va. 60, 65, 471 S.E.2d 489, 492 (1996). "[T]o determine if a product is unreasonably dangerous, a court 'will consider safety standards promulgated by the government or the relevant industry, as well as the reasonable expectations of consumers.'" Norris v. Excel Indus., Inc., 139 F. Supp. 3d 742, 747 (W.D. Va. 2015) (quoting Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993)).

Defendants make five arguments on summary judgment: (1) Shannon's misuse of the Vehicle caused the accident; (2) the alleged defect did not cause the accident; (3) Whitaker has not produced any evidence that the solenoid was not fully connected during manufacture; (4) Whitaker has not produced any evidence that the Vehicle was ever in Defendants' hands; and (5) Whitaker failed to give proper notice of breach to Defendants. The court rejects each argument.

## A.     Misuse

First, Defendants argue that Whitaker's warranty claim fails because Shannon was guilty of misuse of the Vehicle. "While a manufacturer may not be held liable for every misuse of its product, it may be held liable for a foreseeable misuse of an unreasonably dangerous product." Jeld-Wen, 256 Va. at 148, 501 S.E.2d at 396. As noted above, a product's failure to satisfy a governmental standard, such as a safety regulation, means that that product is unreasonably dangerous. Norris, 139 F. Supp. 3d at 747.

Virginia case law distinguishes between foreseeable and unforeseeable misuse of a product. On the one hand, foreseeable misuse will not defeat a claim for breach of warranty.

See Jeld-Wen, 256 Va. at 148, 501 S.E.2d at 396. On the other hand, using a product "in a manner which the seller could not have reasonably foreseen" bars a claim for breach of warranty. Fournier Furniture, Inc. v. Waltz-Holst Blow Pipe Co., 980 F. Supp. 187, 190 (W.D. Va. 1997); see also Turner v. Manning, Maxwell & Moore, Inc., 216 Va. 245, 252, 217 S.E.2d 863, 869 (1975) ("The implied warranty does not apply when the product is being used in a manner or for a purpose for which it was not intended."). Generally, whether misuse is foreseeable is a question for the jury. Tunnell v. Ford Motor Co., 330 F. Supp. 2d 748, 756–57 (W.D. Va. 2004).

Defendants urge the court to find unforeseeable misuse as a matter of law based on Shannon taking the key out of the Vehicle while the Vehicle's transmission was in a position other than Park. Defendants rely on two cases for support. First, Defendants cite Holiday Motor Corp. v. Walters, 292 Va. 461, 790 S.E.2d 447 (2016). In Holiday, Walters sued various Mazda entities after she suffered injuries in a rollover single-car accident. In particular, she claimed that the vehicle, a Mazda Miata convertible, "was unreasonably dangerous for its ordinary and/or foreseeable use in that it would not provide reasonable occupant protection in a foreseeable rollover while being used in its closed top configuration due to defects in the design of the A-pillar, windshield header, and the roof latching system." Id. at 468, 790 S.E.2d at 450 (internal quotations omitted).

The Virginia Supreme Court initially noted that "[t]he absence of a permanent roof structure [in a convertible] necessarily diminishes the level of occupant rollover protection." Id. at 479, 790 S.E.2d at 456. More importantly, the Virginia Supreme Court identified that convertibles were "expressly excluded" from federal regulations designed to increase safety

in rollover accidents. Id. at 479–80, 790 S.E.2d at 456. In reversing the verdict in favor of Walters, the Virginia Supreme Court relied on the fact that "[t]here are no safety standards in existence, promulgated either by the government or the automotive industry, that require convertible soft tops . . . to provide occupant rollover protection." Id. at 482, 790 S.E.2d at 457.

Defendants also appeal to Besser Co. v. Hansen, 243 Va. 267, 415 S.E.2d 138 (1992). In Besser, Hansen sued Besser after he was injured when operating a transfer car manufactured by Besser. Operating on rails, the transfer car moved racks of cement blocks made at the facility where Hansen worked. While that system initially worked properly, it began to either not work or occasionally would derail and the racks would uncouple. The accident occurred with the wheels derailed and some racks uncoupled. The transfer car was operated by means of a three-way switch. Hansen turned the switch to what he thought was the off position, claiming the switch felt like it was off, but actually turned it to the auto position. Thinking that he had turned the power to the transfer car off, Hansen moved between the cars, where he became pinned and was seriously injured.

The Virginia Supreme Court reversed a jury verdict in Hansen's favor. There was no evidence that the three-way switch malfunctioned or that there was a defect in the switch. Id. at 275–76, 415 S.E.2d at 143. Moreover, "Besser's three-way switch had all the necessary components and warnings for a safe operation when used as directed on the instrument panel." Id. at 276, 415 S.E.2d at 143. Instead, "[t]he car would become dangerous only if its operator placed himself in the path of the racks while he had the three-way switch in the automatic mode." Id. at 277, 415 S.E.2d at 144. Additionally, there was a warning light that

"gave ample warning to an operator that he had left the shuttle in 'automatic.'" Id. On these facts, the Virginia Supreme Court reversed the jury verdict because "[t]he car was not unreasonably dangerous when the operator manually coupled the racks because the three-way switch provided ample protection if the switch was turned to its 'off' position." Id. at 278, 415 S.E.2d at 144.

Holiday and Besser provide no support for Defendants' misuse position. The Holiday court reversed a jury verdict for the plaintiff because there was no government regulation or industry standard for rollover protection or for soft-top safety in convertibles. Here, however, a federal regulation expressly governs the removal of a key from a vehicle when the vehicle is in a gear other than park: "Except as specified in S5.2.3,[4] the starting system . . . must prevent key removal . . . , unless the transmission or gear selection control is locked in 'park' or becomes locked in 'park' as a direct result of key removal." 49 C.F.R. § 571.114 ("FMVSS 114") at S5.2.1. This provision of FMVSS 144 was "intended to reduce the incidents of crashes resulting from . . . accidental rollaway of motor vehicles"— the kind of accident that occurred here. Id. at S1. The presence of a safety standard here distinguishes Holiday.

The Besser court reversed a jury verdict because the three-way switch was safe when operated correctly, and there was no evidence of malfunction. Here, however, the solenoid did not function correctly because it was disconnected. If the solenoid had operated correctly, as was required by FMVSS 114, Shannon would not have been able to remove the key while the Vehicle's transmission was in any gear other than Park.

---

[4] Those three exceptions apply only when "steering or self-mobility is prevented," FMVSS 114 at S5.2.3(b), (c), or "[i]n the event of electrical failure, including battery discharge," id. at S5.2.3(a). Neither party argues that these exceptions apply.

While <u>Holiday</u> and <u>Besser</u> provide no support to Defendants' argument, the question remains: Was Shannon's misuse of the Vehicle—by removing the key when the gear was in a gear other than Park—foreseeable to Defendants? The purpose of the solenoid and its related components is to prevent the kind of accident that occurred here. Further, the solenoid (or a system that functions similarly) is mandated by FMVSS 114. Given FMVSS 114 and the purpose of the solenoid, a jury could certainly find that Shannon's alleged misuse of the Vehicle was foreseeable to Defendants.

## B.    Causation

Second, Defendants argue that Whitaker has not proffered sufficient evidence for a reasonable jury to find causation. Defendants' causation argument distills down to a single sentence: "Because Mr. Whitaker has no evidence that key removal caused the accident and caused Mrs. Whitaker's death (as opposed to being a condition discovered after the fact), he cannot recover under any theory." Defs.' Mem. Supp. Mot. Summ. J. ("MSJ Br."), ECF No. 64, at 6. As Defendants elaborate: "Here, we know only that, after the event, the key was out and the vehicle had rolled. There is no evidence which came first, and no evidence that removing the key caused the rollaway." Defs.' Reply Mem. Supp. Mot. Summ. J. ("MSJ Reply"), ECF No. 83, at 5.

The problem with Defendants' argument is that the record contains ample circumstantial evidence from which a jury could conclude that the disconnected solenoid is responsible for the accident.

All of the parties' experts agree on the basic facts as described in the police report:
Shannon

> had driven to her home . . . and was in the process of exiting her vehicle when she became pinned between the vehicle and the house. . . . The vehicle engine was not running, the gearshift lever was in the DRIVE position, and the ignition key was recovered from a location other than the ignition cylinder.

Report of Dr. Charles A. Rau, Jr., ECF No. 65-2, at 2; Eddie Cooper Expert Report ("Cooper Report"), ECF No. 65-3, at 3; Materials Enginering Report of William Carden ("Carden Report"), ECF No. 63-1, at 3; Report of Investigation and Analysis of Richard Clarke ("Clarke Report"), ECF No. 63-1, at 4.

Contrary to Defendants' statement that "[t]here is no evidence that the key was even removed before the vehicle began to roll," MSJ Br. 6, the ignition key was found underneath Shannon, Police Report, at 15, and there were grass stains on her pants suggesting she was dragged along with the car, Clarke Dep., at 55.

Contrary to Defendants' argument that "[t]here is no evidence that the key removal caused the vehicle to roll," MSJ Br. 6, Cooper opines:

> The solenoid is critical to proper function of the vehicle's rollaway protection system . . . . With the solenoid disconnected, the engine can be shut off and the key removed with the shift lever in any position. Leaving the vehicle in such a state can result in subsequent rollaway because the transmission parking pawl is not engaged."

Cooper Report, at 4; see also Clarke Report, at 4. That solenoid, or a system with equivalent functionality, is mandated by FMVSS 114.

Finally, Carden concludes that "the physical evidence present on the subject connector components shows that the subject connection was not fully engaged and locked

at the time of manufacture." Supplemental Materials Engineering Report of William Carden, ECF No. 78-9, at 15; see also Carden Report, at 11. Clarke concludes that the failed solenoid

> is a direct and proximate cause of the accident that occurred on October 16, 2015, allowing Mrs. Shannon Whitaker to remove the ignition key while the SV was in another gear other than Park (P). This is a direct and proximate cause of the accident where Mrs. Shannon Whitaker sustained her fatal injuries.

Clarke Report, at 6.

While Whitaker has to produce evidence sufficient for a reasonable jury to conclude that the disconnected solenoid caused Shannon's death, that evidence can be either direct or circumstantial. "There is no distinction in the law between the weight of value to be given to either direct or circumstantial evidence." Commonwealth v. Hudson, 265 Va. 505, 512, 577 S.E.2d 781, 785 (2003). The evidence produced by Whitaker is sufficient for a reasonable jury to conclude that the solenoid was disconnected at the time of manufacture and caused the accident. To be sure, the jury would need to believe Whitaker's experts over the Defendants' experts. But that determination is the province of the jury.

Defendants' cases are distinguishable. In Beer Distributors v. Winfree, 190 Va. 521, 57 S.E.2d 902 (1950), the Virginia Supreme Court found "no affirmative evidence of negligence of the defendant which was the proximate cause of the accident." Id. at 523–24, 57 S.E.2d at 903. Notably, the two witnesses mentioned by the Virginia Supreme Court both claimed they did not know the cause of the accident. By contrast, in this case, Whitaker's experts testify that the solenoid was never connected (that is, the solenoid left the factory in a faulty state) and caused the accident.

In <u>Richter v. Seawell</u>, 183 Va. 379, 32 S.E.2d 62 (1944), the only evidence in a fatal

car accident was:

> marks on the road which indicated to [the investigating officer] that the car
> had gone off the pavement on the right-hand side and had traveled along the
> dirt shoulder for a distance of one hundred and eighteen yards, that it had
> then swerved to the left onto the pavement and after skidding sideways to the
> left, had proceeded diagonally along the pavement for a distance of
> approximately seventy-four yards, and gone thence off the pavement on the
> left and down a seven-foot embankment, and had struck a tree some twenty-
> seven feet to the left of the road.

<u>Id.</u> at 381, 32 S.E.2d at 63. When the officer arrived, there was drizzle, "but there [was] no

evidence as to how long the condition had existed, or what was the state of the weather at

the time of the accident." <u>Id.</u> Finally, there was no evidence that the driver had driven

negligently, such as an indication that he exceeded the speed limit. In other words "there

[was] a total lack of evidence as to what caused" the accident. <u>Id.</u> at 382, 32 S.E.2d at 63.

By contrast, here the evidence is undisputed that the solenoid was not connected, and

Whitaker's experts opine that it had never been fully connected. Further, the Vehicle

behaved exactly as one would expect after the ignition key was removed while the

transmission was not set in the Park position. There is evidence that Shannon was dragged

by the car after she removed the ignition key. As such, there is both circumstantial and

expert testimony that the disconnected solenoid caused the accident.

Defendants' appeal to <u>Holbrook v. Davidson</u>, No. 2:13cv00027, 2014 WL 198222

(W.D. Va. Jan. 15, 2014), fares no better. Holbrook either fell up or down a flight of stairs

and died. The reporting officer "was unable to determine whether Holbrook was going up or

down the stairs when she fell, nor was he able to determine the cause of the fall." <u>Id.</u> at *2.

Again, the evidence was unclear on what caused the fall. <u>See id.</u> at *4. Indeed, the officer

"stated he did not find one or the other . . . possibilities more probable than the other." Id. Here, however, Whitaker's experts testify that they believe only one possibility could have occurred—the disconnected solenoid caused the accident.

### C.    Admissible Evidence

Third, Defendants argue that Whitaker has failed to produce any evidence suggesting that the solenoid was disconnected at the time of manufacture. As Defendants admit, however, this argument is contingent upon the court granting Defendants' Daubert motion. Instead, the court has already denied that motion in its entirety. As the court concluded above, Whitaker's experts will be permitted to express their opinions that the solenoid was not fully connected at the time of manufacture. Accordingly, this argument is without merit.

### D.    Wrong Manufacturer

Fourth, Defendants argue that they cannot be held liable for the accident because the vehicle was manufactured by Hyundai Motor Manufacturing Alabama, LLC ("Hyundai Alabama"), not Defendants. Notably, the only evidence that Defendants produce to support this contention is attached to their Reply: an affidavit from Greg Webster, an employee of HMA, stating that the Vehicle "was manufactured by Hyundai Motor Manufacturing Alabama, LLC." Declaration of Greg Webster, ECF No. 83-1, ¶ 4.

The manufacturer of the Vehicle is not dispositive, however. As Defendants admit, Whitaker must show that "the unreasonably dangerous condition existed when the goods [that is, the Vehicle] left the defendant's hands." Logan, 216 Va. at 428, 219 S.E.2d at 687; see also MSJ Reply 4 (citing Logan).

Nothing in that legal rubric requires courts to equate a product "leaving a defendant's hands" with a "defendant manufacturing the product." Instead, courts apply the "apparent manufacturer doctrine," pursuant to which "an entity holding itself out as the manufacturer may be subject to the same liability as the actual manufacturer." Bilenky v. Ryobi Techs., Inc., 666 F. App'x 271, 274 (4th Cir. 2016). The Fourth Circuit has applied "the apparent manufacturer doctrine where entities put out products as their own," even if the apparent manufacturer "was neither the designer nor manufacturer." Bilenky v. Ryobi Techs., Inc., 115 F. Supp. 3d 661, 671–72 (E.D. Va. 2015), aff'd 666 F. App'x 271 (4th Cir. 2016). Accordingly, "a defendant warrants a product's merchantability and assumes the responsibilities of a manufacturer when it sells a product under its trade name." Id. at 672.

Whitaker has produced ample evidence for a jury to conclude that the Vehicle was sold under the Hyundai trade name, rendering Defendants liable. Exhibit E to Whitaker's Motion for the Court to Take Judicial Notice of Public Records is a trademark registration of the Hyundai trade name.[5] ECF No. 80, Ex. E. The owner of the trade name is HMC. Exhibit F to the same motion is a trademark registration of the Hyundai mark. The owner of the mark is HMA. Exhibit G to the same motion is a 2014 Lanham Act complaint filed by

---

[5] Whitaker filed a Motion for the Court to Take Judicial Notice of Public Records, ECF No. 80, which asks the court to take judicial notice of two trademark registrations—one submitted by each Defendant—and one complaint filed by HMA. Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "The Court may take judicial notice of information in the public record, such as [trademark] registrations in the Principal Register." Booking.com B.V. v. Matal, 278 F. Supp. 3d 891, 911 n.6 (internal citation omitted) (citing Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)). Similarly, the court may take judicial notice of official public records, which includes complaints filed in other courts. See Witthohn v. Fed. Ins. Co., 164 F. App'x 395, 396–97 (4th Cir. 2006); Gasner v. Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995) (permitting district court to take judicial notice of public documents, such as court records, even when the documents are neither referenced nor integral to plaintiff's complaint).

The first two documents are trademark registrations, while the third is a complaint filed by Hyundai America in the Central District of California. The court may take judicial notice of all three documents. Accordingly, Whitaker's Motion for Court to Take Judicial Notice is **GRANTED**.

HMA in the U.S. District Court for the Central District of California. ECF No. 80, Ex. G. In that complaint, HMA pleads that "HMA has been granted the exclusive license by [HMC] to distribute goods and services in North America in association or in connection with the trademarks, trade names and/or trade dress of HMC," and that "HMA is also the owner of certain other trademarks associated with the Hyundai line of automobiles and automobile parts."[6] Id. ¶ 5. The evidence proffered by Whitaker is clearly sufficient to survive summary judgment on the apparent manufacturer doctrine/seller issue.

### E.    Reasonable Notice

Finally, Defendants argue that Whitaker violated the "reasonable notice" provision of Virginia Code Section 8.2-607. The relevant provision provides that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Va. Code Ann. § 8.2-607(3)(a). A plaintiff bears the burden of proof to show that notice was given within a reasonable time. Begley v. Jeep Corp., 491 F. Supp. 63, 65 (W.D. Va. 1980). Ordinarily, reasonableness is a question for the jury, but "if the evidence is clear, the court can rule as a matter of law that a party failed to give proper notice." Id. In determining whether notice is timely, a court can consider whether it deprived the seller "of the opportunity (1) to investigate the claim in a timely manner; (2) to participate in settlement negotiations before full-scale litigation; and (3) to timely depose potential witnesses, whose memories have since been dimmed by time." Id. at 66.

---

[6] It is true that "Virginia has not addressed whether the apparent manufacturer doctrine may apply to an entity outside the chain of distribution of a product that nonetheless bears the entity's name." Bilenky, 666 F. App'x 275. Nonetheless, Whitaker's Exhibit G shows that, at least in 2014, HMA placed itself firmly in the manufacturing chain, and Defendants have not submitted any evidence suggesting otherwise. The court need not resolve that open question now.

Defendants argue that Whitaker never notified Defendants of the breach, as defined by Section 2-607, and certainly did not do so within a reasonable period of time. In this case, the breach complained of by Whitaker and contemplated by Section 8.2-607 is the claimed failure to connect the solenoid during the manufacturing process. Both Defendants and Whitaker learned of the disconnected solenoid at the same time: during the October 25 and 26, 2017 initial examination of the Vehicle. See Carden Report, at 5; Cooper Report, at 3; Cooper Dep., at 43:4–12. Moreover, Defendants' expert Cooper admits that Webster, an HMA employee, was present alongside Whitaker's and Defendants' experts. Cooper Dep., at 42:8–12. In other words, Defendants received notice of the claimed breach at the same time as Whitaker. There is no breach of Section 8.2-607's notice provision.

## V. Conclusion

Ultimately, Whitaker has produced enough evidence in the record to send this case to a jury. The Motions in Limine filed by both sides are **DENIED**. Defendants' Motion for Summary Judgment is **DENIED**.

Entered: 10/09/2018

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge